SUN TRUST BANK, Miami, as Personal Representative of the Estate of Chad Humphreys, deceased, Plaintiff,

v.

SUN INTERNATIONAL HOTELS LIM-ITED, a Bahamian company and Sun International Bahamas Limited, a Bahamian company, Defendants.

No. 00CV3741.

United States District Court,
S.D. Florida.

Dec. 10, 2001.

Mark Hicks, Dinah S. Stein, Hicks Anderson & Kneale, Miami, FL, Robert L. Parks, William Andrew Haggard, Jeannete Lewis Bologna, Haggard Parks Haggard & Bologna, Carol Gables, FL, for plaintiff.

Fred Owen Goldberg, Berger Singerman, Miami, FL, for defendants.

## *ORDER DENYING DEFENDANTS' MOTION TO DISMISS*

HUCK, District Judge.

### BACKGROUND

Plaintiff, Sun Trust Bank, Miami, as the personal representative of the Estate of Chad Humphreys, has sued defendants Sun International Hotels Limited and Sun International Bahamas Limited for damages arising out of the death of twelve-year old Chad Humphreys, who was killed while snorkeling in a recreational lagoon at the Atlantis Hotel on Paradise Island, in the Bahamas. Defendants have filed a Motion to Dismiss predicated upon (1) lack of personal jurisdiction; (2) improper venue; and (3) *forum non conveniens.* For the reasons that follow, the Motion to Dismiss [DE # 15–1] IS DENIED.

### FACTS

*The resort*

The Atlantis resort where this tragic accident occurred is located on Paradise Island, in the multi-island nation of the Bahamas. Tourism is the Bahamas' largest industry and provides 75% of that country's work force with jobs. *Bethell Dec.,* ¶ 7. And Atlantis is indeed an international tourist attraction. Sun Hotels maintains addresses in France, Germany, Japan, Maritius, the United Kingdom, South Africa and Ft. Lauderdale, Florida. *Complaint,* ¶ 17F. Visitors from around the world can make reservations through the Atlantis website. *H. Karawan Dep.,* p. 17; *P. O'Neil,* pp. 8, 15, ex. 2. Of the 85% of Atlantis visitors that come from the

United States, 14% are from Florida. *H. Karawan 1996 Dep.*, pp. 32–35, 41–42.

*Events relating to the trip and the incident*

Ms. Humphreys reserved her family's stay at the Atlantis in advance from the United States, by using an interactive website. When the family arrived at the Atlantis, Ms. Humphreys was presented with a Guest Registration Form to sign at the front desk. The backside of this form contains a forum-selection clause laying venue in the Bahamas for any action arising out of events occurring there. When she made her reservations, Ms. Humphreys was not informed that she would be asked to sign a forum-selection clause upon her arrival in the Bahamas. Indeed, it is undisputed that the forum-selection clause was presented to her for the first time when she arrived to check in at the hotel, after she had traveled from South Florida to the Bahamas with her two children.

The Guest Registration Form is presented to the guest with the forum-selection clause facing up. *Conway Dep.*, pp. 22–23. The guest is asked to verify the departure date, read the printed language, and then sign the form. *Id.* at 12, 20, 23. It is undisputed that the desk clerk is not trained to explain the forum-selection clause, and that Ms. Humphreys was not told that she was signing one. Plaintiff admits that she was aware that there was printed language above her signature, but did not read it.

The Court need not detail the tragic event causing Chad's death. Suffice it to say that Chad was killed instantly when sucked into an intake pipe while snorkeling in Atlantis' "Paradise Lagoon."[1] Atlantis personnel coordinated the recovery efforts and freed Chad's body from the pipe. Bahamian police investigated the incident, interviewed witnesses, and prepared reports. Chad's body was taken to a local Bahamian hospital. Chad's uncle, Greg Labosky, flew from his home in South Florida to identify it. The coroner's report lists the cause of death as "a direct result of blunt trauma." *See, generally, Plaintiff's Answers to Defendant's First Interrogatories ("Plaintiff's First Answers ")*.

Atlantis guests from Washington State and New Jersey witnessed the rescue/recovery efforts and Ms. Humphreys' condition during the episode. Two Florida residents snorkeled in the lagoon in the days before the event and observed that portions of a protective grate in the vicinity of the intake pipes was missing. *Plaintiff's Answers*, at 34, 68–69, 70–71.

*The defendants*

Defendants Sun International Hotels Limited ("Sun Hotels") and Sun International Bahamas Limited ("Sun Bahamas") are corporations organized under the laws of the Bahamas. Sun Hotels is the sole shareholder and owner of Sun Bahamas. Both are holding companies and neither directly owns nor operates the Atlantis Hotel. The Atlantis Hotel is owned and operated by two of Sun Bahamas' wholly-owned Bahamian subsidiaries, Island Hotel Company, Ltd. ("Island Hotel") and Paradise Island, Ltd. ("Paradise Island").

Sun Hotels is also the sole shareholder and owner of Sun International North America, Inc. ("Sun North America"), a Delaware corporation with its principal place of business in Florida. Sun North America and its Florida subsidiaries, Sun International Resorts, Inc. ("Sun Resorts") and Paradise Island Vacations, Inc. ("Island Vacations"), provide a variety of financial, administrative, marketing and reservations services to Sun Hotels and Sun Bahamas in Florida. Each defendants'

---

**1.** The lagoon contains several waterfalls which are powered by suction pumps.

contacts with this forum are detailed separately below, but the following schematic is initially useful in understanding the various Sun entities' relationships with each other:

## THE SUN CORPORATE NETWORK

### i. Sun Hotels

Sun Hotels is a public corporation, traded on the New York Stock Exchange. As a public corporation, Sun Hotels is required to have an authorized representative in the United States. *J. Allison Dep.,* p. 22. John Allison is the Executive Vice-President and CFO of Sun Hotels. *Id.* at 5. He is identified on SEC filings as the principal financial and accounting officer and authorized representative of Sun Hotels in the United States. *Id.* at pp. 18–20. SEC filings from 1999 and 2000 reflect that Sun Hotels' has an executive office located at 1415 East Sunrise Boulevard, in Ft. Lauderdale, Florida. *Id.; see also Exhibits to J. Allison Dep..* Mr. Allison maintains an office at this address in his capacity as CFO of Sun Hotels. *Id.* at 6. In addition to being the CFO of Sun Hotels, Mr. Allison is also a salaried employee of Sun North America. Sun North America's offices are located in the same building as Sun Hotels' executive office in Ft. Lauderdale, and Mr. Allison also maintains

an office there in his capacity as an employee of Sun North America. *Id.*

Sun Hotels has a written Services Agreement with Sun North America. Pursuant to the agreement, Sun North America provides Sun Hotels with certain financial services, such as the preparation of consolidated financial reports and SEC filings. Sun North America also employs an investor relations manager to provide services to Sun Hotels' shareholders. *Id.* at 13, 15, 30, 32, 64–65, 67, 72. Sun North America receives a fee for the services it performs for Sun Hotels. Sun North America is the only entity that renders these services to Sun Hotels, and it does so from the Sun North America offices in Ft. Lauderdale, Florida.

Sun Hotels has guaranteed the lease for 1415 East Sunrise Boulevard, the ten-story building in Ft. Lauderdale, Florida, where it has an executive office. Sun North America and its subsidiaries (Sun Resorts and Island Vacations) also have their offices there.

### ii. Sun Bahamas

Sun Bahamas also has written Services Agreements for administrative, financial, marketing and reservations services with Sun North America and its Florida subsidiaries, Sun Resorts and Island Vacations. *Id.* at 41, 46–47, 56, 70–71.

Sun Resorts provides accounting and financial services for Sun Bahamas. *W. Clifford Dep.*, p. 12. These services include collections, accounts payable, and production of general ledgers and monthly financials for Sun Bahamas. *W. Clifford Dep.*, pp. 6–7. Sun Resorts provides these services for Sun Bahamas in South Florida, and arranges for the financial statements to be audited annually by Arthur Anderson in South Florida. *Id.* at 20–21. Sun Resorts also oversees millions of dollars in bank transactions made in Sun Bahamas' Miami Bank accounts. *J. Allison Dep.*, p. 47. Its Ft. Lauderdale office has direct computer access to Sun Bahamas accounts receivable and Sun Bahamas' general ledger. *K. Lewis Dep.*, pp. 14–15, 17, 21–22.

Sun Resorts exists primarily for the purpose of providing accounting and financial services to Sun Bahamas. *Id.* at 12. Each year, Sun Resorts receives 3% of Sun Bahamas' gross revenues as its fee pursuant to the Services Agreement. *Id.* at 5. Any of the 3% that is in excess of Sun Resorts' operating expenses at the end of the year is then returned to Sun Bahamas. *Id.* at 10–11. Of the collections that Sun Resorts receives in a given year, approximately 95% is for monies owed to Sun Bahamas. *K. Lewis Dep.*, p. 5.

Sun Resorts also provides marketing and advertising services to Sun Bahamas for the Atlantis. *H. Karawan Dep.*, p. 3; *J. Eder Dep.*, pp. 14–15, 22–23. Sun Bahamas has final approval regarding what type of advertising is done and how much money is spent on it. *P. O' Neil Dep.*, p. 54–55. Pursuant to its contractual obligation to provide reservations services to Sun Bahamas for the Atlantis, Sun Resorts operates Island Vacations, a travel company that functions as Atlantis' reservations center and arranges vacation/travel packages to the resort. *J. Eder Dep.*, p. 14–15, 22–23. Approximately 40% of all reservations for Atlantis are made directly through Island Vacations' Ft. Lauderdale office. *J. Conway Dep.*, pp. 15–16. Island Vacations also maintains a Quality Assurance Department that coordinates communications when a problem arises involving an Atlantis guest. *H. Karawan Dep.*, 25–26.

Sun Bahamas maintains various bank accounts at City National Bank in Miami, Florida. *L. Naughton Dep.*, p. 4. Sun Bahamas has a Repurchase Agreement with City National Bank, which allows Sun Bahamas to earn interest on its checking accounts. *Id.* at pp. 7–8. One randomly chosen statement of Sun Bahamas' City National Bank accounts reflects wire transfers among the various Sun entities totaling close to $80 million. *J.B. Farrnington Dep.*, p. 50, 53–55; *G. Albury Dep.*, Ex. 4, 5.

In addition to its Service Agreements with the various Sun subsidiaries, Sun Bahamas also purchases goods and services for the Atlantis directly from Florida vendors. *See, e.g. L. Kersten Dep.*, pp. 7–11, 14–15. By way of example, Sun Bahamas has entered into a number of contracts with a Florida corporation called Leonard Parker Co. for the purchase of furniture, fixtures and other equipment for the Atlantis. *See L. Hein Dep.*, pp.3–6, Ex. 2, 3. Pursuant to these contracts, Leonard Parker purchases millions of dollars of supplies for the Atlantis out of its Florida office. *Id.* at 11–12, 23–26, Exs. 4–10. Sun Bahamas has also executed a contract in Florida with another Florida corporation, Tropical Shipping, to bring daily ship-

ments of goods to the Atlantis. *P. O'Neil Dep.*, pp. 57–58. It is undisputed that approximately 5% of Sun Bahamas' annual purchasing budget is expended in Florida. *L. Kerstein Dep.*, p. 28.

### iii. Alleged overlap among the various Sun entities [2]

Sun Hotels and Sun Bahamas officers and employees regularly visit the Ft. Lauderdale offices of Sun North America, Sun Resorts and Island Vacations for various business purposes relating to issues covered by their Services Agreements; employees of the Florida entities also travel to the Bahamas. *See, e.g., J. Boocher Dep.*, pp. 8–9; *S. Kaiser Dep.*, pp. 25–26; *J. Eder Dep.*, p. 27; *L. Kersten Dep.*, pp. 19–20, 25; *P. O'Neil Dep.*, pp. 50–52; *G. Albury Dep.*, pp. 15–19; *G. Pyfrom Dep.*, pp. 65–66; *H. Karawan Dep.*, pp. 39–40. John Allison, the CFO of Sun Hotels and an employee of Sun North America, acts as a contact person for Sun Bahamas in its dealings with City National Bank and also signs on behalf of Sun Bahamas at City National Bank. *L. Naughton Dep.*, p. 12, 23. Various Sun Hotels, Sun North America and Sun Resorts officers and employees are authorized to approve large transactions made in Sun Bahamas' Miami bank accounts. Sun Bahamas employees are also authorized to sign on these accounts. *L. Naughton Dep.*, pp. 13–17, 20–21; *J. Allison Dep.*, p. 27.

A website which provides general information regarding the Sun entities characterizes the "owners" of Atlantis as being "Sun International Hotels Limited NYSE:SIH." *H. Karawan Dep.*, p. 31–32; *P. O'Neil Dep.*, pp. 10–11. Advertising materials for the Atlantis, both printed materials and electronically maintained webpages, all direct potential customers to

contact the Florida subsidiary corporations at the Ft. Lauderdale address. These facts are undisputed, and are detailed in the plaintiff's brief. *See, generally, Plaintiff's Response to the Motion to Dismiss*, pp. 7–9. Many of these materials provide telephone numbers where interested customers can make reservations. The listed numbers connect to Sun Resorts' Ft. Lauderdale office and are answered "Sun International." The caller is then transferred to Island Vacations to make their reservations. *H. Karawan Dep.*, pp. 9–11; *J. Conway Dep.*, p. 13; *P. O'Neil Dep.*, p. 17. The registration card that Atlantis guests sign bears the name of several Sun entities, including Sun Hotels, Sun Bahamas, Island Hotel and Paradise Island. *J. Conway Dep.*, pp. 44–45.

*Potential third-party defendants*

Splash, Ltd., a Bahamian entity beyond this Court's jurisdiction, was responsible for operation and management of Atlantis' pool facilities, including the lagoon, on the day of the incident. *Pyfrom Dec.*, ¶¶ 31–32. Splash's duties include maintaining beaches, pool decks, chairs, slides and towel huts. *S. Kaiser Dep.*, pp. 4–5; *J. Conway Dep.*, p. 8; *J.B. Farrington Dep.*, pp. 17–18; *G. Albury Dep.*, p. 47. Splash is also required to have a lifeguard posted and to enforce a rule that no unescorted minors swim in the lagoon, which they apparently did not do on the day of the incident. *Pyfrom Dep.*, pp. 23, 30–33. Splash's lifeguards were also required to swim in the lagoon each morning to look for hazardous conditions. *Id.* at 33. Splash, however, has nothing to do with maintenance of the lagoon's pumps and waterfalls, and have no access to this part of the attraction. *J. Borchers Dep.*, p. 15; *P. O'Neil Dep.*, p. 67; *A. Zarazosa Dep.*, p.

---

**2.** The parties dispute whether the corporate identities of the various Sun entities should be disregarded for purposes of determining

whether the Court has personal jurisdiction over the defendants.

18. The Water Features Department has exclusive control over the pump equipment, is responsible for maintaining the protective grates, and sends divers once a week to inspect the structure. *S. Kaiser Dep.*, p. 3–4, 7–8, 17; *P. O'Neil Dep.*, p. 39; *A. Zarazosa Dep.*, p. 16.

Centex–Rooney was the general contractor for the Atlantis, including the lagoon. Poole & Kent was the subcontractor responsible for construction of the saltwater pumping system. Defendant alleges that these contractors did not construct the pump facilities at issue with a one-piece grate as called for by the blueprints, and as they were required to do. Defendants' contracts with both of these companies contain a voluntary arbitration agreement and, in the alternative, a forum-selection clause laying venue in the Bahamas for any claim arising out of breach of the construction contract. *See R. Watkins Dep.*, p. 12, 17–18; *Phase I Contruction Contract; Poole & Kent Subcontract.*

## DISCUSSION

Because personal jurisdiction is a constitutional issue, the Court will first address defendants two venue-related grounds for dismissal. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)(declining to reach personal jurisdiction because enforceability of forum-selection clause dispositive, and constitutional question was thus not necessary to decide case).

*The Forum Selection Clause*

*Standard of Review*

As a threshold matter, the parties dispute the applicable standard for evaluating the enforceability of the forum-selection clause at issue in this lawsuit. Defendants urge the Court to follow the standard set forth by the Supreme Court in the *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) and *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), wherein forum-selection clauses enjoy a presumption of validity, which can be overcome by a "strong showing" that enforcement would be unjust, unfair or unreasonable under the circumstances. *See Shute*, 499 U.S. 585 at 593–94, 111 S.Ct. 1522; *Lipcon v. Underwriters at Lloyd's London*, 148 F.3d 1285, 1295–96 (11th Cir. 1998); *see also Manrique v. Fabbri*, 493 So.2d 437, 440 n. 4 (1986). Plaintiff, on the other hand, argues that this Court should apply what it characterizes as the "less stringent" standard set forth in *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), wherein the parties' selected forum is neither dispositive nor irrelevant, but rather one of several factors the Court must weigh in deciding a motion to transfer venue brought pursuant to 28 U.S.C. § 1404(a). *Stewart*, 487 U.S. at 31, 108 S.Ct. 2239.

■ The *Bremen/Shute* factors for evaluating the fairness, reasonableness and enforceability of a forum-selection clause generally encompass the same policy considerations implicated in a motion to transfer under 28 U.S.C. § 1404(a) premised upon the existence of a mandatory forum-selection clause. *See Stewart*, 487 U.S. at 33, 108 S.Ct. 2239 (Kennedy, J. *concurring* )("The justifications we noted in *The Bremen* ... should be understood to guide the District Court's analysis under § 1404(a) ... so that a valid forum-selection clause is given controlling weight in all but the most exceptional cases."). Whether these policy considerations are weighed under § 1404(a) or under the *Bremen/Shute* paradigm is more a function of whether the purportedly contracted-for forum lies within or without the United States and, consequently, whether the defendant chooses § 1404(a) or Rule 12(b)(3) as its procedural vehicle for relief. *See Lipcon*, 148 F.3d at 1290 n. 3; *see also XR*

*Co. v. Block Balestri, P.C.*, 44 F.Supp.2d 1296, 1298 (S.D.Fla.1999); *Polar Manufacturing Corp. v. Michael Weinig, Inc.*, 994 F.Supp. 1012, 1018 (E.D.Wis.1998). What matters in either context is that the Court considers the factual circumstances presented and determines whether the contract should be given effect, taking into account not only the strong policies favoring forum-selection clauses, but also considerations of fairness and justice that might militate against enforcement in a particular case. *See Shute*, 499 U.S. at 593, 111 S.Ct. 1522 (reaffirming *Bremen* paradigm's presumption of validity, and emphasizing that such clauses contained in "form" contacts are subject to "judicial scrutiny for fundamental fairness"); *Stewart*, 487 U.S. at 29–31, 108 S.Ct. 2239 (explaining that presence of forum-selection clause will be a "significant factor that figures centrally in the district court's calculus," but that § 1404(a) also requires consideration of "those public interest factors of systemic integrity and fairness that ... come under the heading of 'the interests of justice'").

Plaintiff argues that the applicable standard of review is still an open question when a federal court sits in diversity, citing *Amermed Corp. v. Disetronic Holding AG.*, 6 F.Supp.2d 1371, 1373 (N.D.Ga. 1998). However, the Eleventh Circuit has since applied the *Bremen* factors in the context of a 12(b)(3) motion to dismiss premised on a forum-selection clause in a diversity case, and this Court is bound by that decision. *Lipcon*, 148 F.3d at 1290–91, 1295–96; *see also XR Co.*, 44 F.Supp.2d at 1298 (noting that *Lipcon* dispelled any uncertainty regarding whether motions to dismiss based on forum-selection clauses were cognizable as 12(b)(3) motions). Plaintiff attempts to distinguish *Lipcon* on the basis that the forum-selection clause at issue there was contained in a freely negotiated international agreement, whereas here we have hotel guest signing a pre-

printed "form" contract. This argument is unpersuasive for two reasons. First, the Supreme Court's decision in *Shute* refined the *Bremen* analysis to take into account the commercial realities and unequal bargaining power of the consumer in the travel context. *Shute*, 499 U.S. at 593, 111 S.Ct. 1522 (applying *Bremen* to forum-selection clause contained in non-negotiated form contract printed on passenger's cruise-ship ticket). Second, plaintiff places too much emphasis on the existence or absence of an arm's-length transaction.

The rule of *The Bremen* is driven more by the international character of the transaction than the negotiability of the agreement. *See Lipcon*, 148 F.3d at 1294–95 (noting that main concerns underlying *Bremen* were ensuring orderliness and predictability in international business transactions, and furthering international comity); *see also Shute*, 499 U.S. at 593, 111 S.Ct. 1522 (noting salutary effects of forum-selection clause contained in non-negotiated cruise-ship ticket where ship carries passengers from many locales); *Manrique*, 493 So.2d at 439 (noting that *Bremen* rule is rapidly becoming the majority view because of its "realistic assessment of modern commercial culture" and because it "enhances contractual predictability"). As the Supreme Court has noted, the policy considerations for affording forum-selection clauses a presumption of validity in the context of freely negotiated agreements apply equally to form contracts drafted by cruise ships and resorts such as Atlantis, whose guests come from all over the world. *Shute*, 499 U.S. at 593, 111 S.Ct. 1522. The only difference is that, in the context of a "form" contract, the *Bremen* test must take into account the consumer's inability to negotiate terms and the economic realities of the transaction. *Id.*. *Shute* has done this, and the

Court will apply that standard.[3]

■ Having determined the proper procedural framework, the Court must now determine whether the forum-selection clause at issue in this case passes muster. The starting point for the analysis, of course, is the presumption that the clause is valid and enforceable. *Lipcon,* 148 F.3d at 1291. This presumption may be overcome by a "strong showing" that enforcement would be unjust, unfair or unreasonable under the circumstances. *See Shute,* 499 U.S. 585 at 593–94, 111 S.Ct. 1522; *Lipcon,* 148 F.3d at 1295–96 (11th Cir.1998). This inquiry is thus necessarily fact-sensitive, and must be done on a case-by-case basis. *Shankles v. Costa Armatori, S.P.A.,* 722 F.2d 861, 864 (1st Cir.1983)(differing circumstances may render clause contained in same cruise-ship ticket binding on one passenger, yet invalid as to another); *see also Corna v. American Hawaii Cruises, Inc.,* 794 F.Supp. 1005, 1008 (D.Hawai'i 1992).

■ A forum-selection clause will be invalidated only when: a) it was induced by fraud or overreaching; b) the plaintiff effectively would be deprived of its day in court because of inconvenience or unfairness of the chosen forum; c) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or d) enforcement of the provisions would contravene a strong public policy. *Lipcon,* 148 F.3d at 1292. Some courts have artic-

ulated *Shute*'s refinement of the test as requiring particular examination several additional factors, including: 1) whether there is an indication that the forum was selected to discourage legitimate claims; 2) whether the clause was induced by fraud and overreaching; 3) whether the consumer was given adequate notice of the forum selection clause; and 4) whether the consumer retained the option of rejecting the clause with impunity. *Stobaugh,* 5 S.W.3d 232, 234 (Tex.App.1999). Because *Shute*'s refinement of the *Bremen* is primarily concerned with the unequal bargaining power of the parties, these additional factors are most logically analyzed under the broad heading of "fraud and overreaching."

*Fraud and Overreaching*

*i. Bad Faith*

■ In determining whether the defendant has selected a particular forum in bad faith as a means to discourage and/or prevent potential plaintiffs from bringing legitimate claims, the courts look to a) whether the selected forum is where the defendant is incorporated, maintains its principle place of business, or performs its corporate management functions; b) whether potential plaintiffs reside in a variety of locations throughout the United States or the world; and c) whether the selected forum has some connection with underlying transaction. *See Shute,* 499

---

**3.** To the extent that plaintiff may be citing *Amermed* to suggest that the Court should engage in an *Erie* analysis, the Court declines to do so. First, although *Lipcon* did not explicitly consider the question of whether a federal court sitting in diversity should apply state or federal common law in the context of a 12(b)(6) motion premised upon a forum-selection clause, *Lipcon* nevertheless applied the federal standard. More importantly, however, is that the result would be the same under state and federal law. As reflected in this section, the Florida Supreme Court has

embraced the policy considerations underlying the rule of the *Bremen* in the context of freely negotiated international agreements. *Manrique v. Fabbri,* 493 So.2d 437 (1986). There is no reason to believe that Florida would not similarly adopt *Shute*'s "refined" analysis, which takes into account the economic realties of the transaction in the context of a non-negotiated "form" contract. *See Lambert v. Kysar,* 983 F.2d 1110, 1116 (1st Cir.1993)(declining the apply *Erie* doctrine because all potentially applicable law would yield same result).

U.S. at 595, 111 S.Ct. 1522; *Corna,* 794 F.Supp. at 1011. The forum selected here is the site where the facility is located and, consequently, where any accident would occur. Both defendants are Bahamian corporations, catering to visitors (and potential plaintiffs) from all over the United States and the world. And although the defendants have business contact with Florida as well as the Bahamas, it cannot be said that they have chosen some remote, alien forum that has no connection to its business or the underlying transaction that might be the subject of litigation. *See Shute,* 499 U.S. at 595, 111 S.Ct. 1522; *Corna,* 794 F.Supp. at 1011. This factor thus weighs in favor of enforcing the clause.[4]

### ii. Reasonable Notice

■ A non-negotiated forum-selection clause is not invalid simply because it is contained on a pre-printed form. *Shute,* 499 U.S. at 593, 111 S.Ct. 1522. The concern in this setting, given the parties unequal bargaining power, is whether the terms of the clause was reasonably communicated to the consumer and are otherwise fundamentally fair. *See Shankles,* 722 F.2d at 863–66; *Corna,* 794 F.Supp. at 1008. A useful two-part test of "reasonable communicativeness" developed by federal courts takes into account both the physical characteristics of the contract itself, and also any extrinsic factors indicating the plaintiff's ability to become meaningfully informed and to reject the contractual terms at stake. *Shankles,* 722 F.2d at 863–66.

Here, the contested forum-selection clause appears on the backside of the Guest Registration Form. The backside of the Guest Registration Form contains three paragraphs: a) the departure date, b) the forum selection clause; and c) a clause wherein the guest agrees to be liable for the bill incurred during the stay. The backside of the registration form physically appears as reproduced here:

**ATLANTIS** PARADISE ISLAND

SETTLEMENT METHOD
I WILL DEPART ON ___8-9-00___

"I agree that any claim I may have against Atlantis, Ocean Club, or any of their officers, directors, employees or related or affiliated companies, including, without limitation, Sun International Hotels Limited, Sun International Bahamas Limited, Island Hotel Company Limited, Paradise Enterprises Limited, Paradise Island Limited and Paradise Beach Inn Limited resulting from any events occurring in The Bahamas shall be governed by and construed in accordance with the laws of the Commonwealth of The Bahamas, and further, irrevocably agree to the Supreme Court of The Bahamas as the exclusive venue for any such proceedings whatsoever. The foregoing shall apply to all persons accompanying me and I represent that I have the authority to sign this document on their behalf."

I AGREE THAT MY LIABILITY FOR THIS BILL IS NOT WAIVED AND I AGREE TO BE HELD PERSONALLY LIABLE IN THE EVENT THAT THE INDICATED PERSON, COMPANY, ASSOCIATION FAILS TO PAY FOR THE FULL AMOUNT OF THE CHARGES ACCOUNT PAYABLE ON PRESENTATION OR DEPARTURE. I AGREE THAT THE HOTEL WILL NOT BE HELD RESPONSIBLE FOR GOODS OR VALUABLES LEFT IN MY ROOM. SAFETY DEPOSIT BOXES ARE AVAILABLE.

GUEST SIGNATURE X *Sharon Humphreys*

■ In order to be enforceable the forum-selection clause in a form contract must reasonably warn the consumer that the terms and conditions are important

---

4. Indeed, plaintiff does not appear to suggest that defendants selected the Bahamas in bad faith. The thrust of its argument, rather, is that enforcement in this case would be fundamentally unfair because Mrs. Humphreys was not given reasonable notice of the forum-selection clause, and also because she would be effectively deprived of a remedy and her day in court.

matters affecting legal rights. *See Hirsch v. Klosters Rederi A/S*, 521 So.2d 316, 317 (Fla. 3rd DCA 1988)(*citing Silvestri v. Italia Societa Per Azioni Di Navigazione*, 388 F.2d 11, 17 (2nd Cir.1968). Thus, not only must the operative language be sufficiently clear as to its import and meaning, but the clause itself must also be physically conspicuous and "eye-catching" in the printed document. *See DeNicola v. Cunard Line Ltd.*, 642 F.2d 5, 8 (1st Cir. 1981). Features such as size of type, conspicuousness and clarity of notice on the face of the contract, and the ease with which the plaintiff can read the provisions are all important considerations which, again, must be assessed on a case-by-case basis. *Shankles*, 722 F.2d at 864).

Here, contrary to plaintiff's assertion, the clause is not hidden among other print or physically disguised so as to sneak by unnoticed. It is undisputed that the Guest Registration Form is presented to the guest with the backside containing the forum-selection clause facing up. And as the reproduction above reveals, there is very little printed language on the backside of the form, which the guest is required to separately sign. The forum selection clause is set apart as a separate paragraph, in legible type. It begins conspicuously with the words "I agree," just as the following paragraph regarding liability for the hotel bill. It takes only a quick glance at the printed language to reveal that the guest is agreeing to everything on the backside of the registration form. Ms. Humphreys did not realize that she was signing a restrictive clause because she did not read it before signing, not because it was hidden from her. *See Corna*, 794 F.Supp. at 1010 (a party cannot avoid the effect of contractual provisions by choosing not to read them); *Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir.1987)(passenger knowledge that there is printed material on ticket that passenger chooses not to read points to knowledge of terms of contract).

In addition, the language is sufficiently clear so as to put the guest on notice of the legal matters contained therein. It states that any claims the guest may have against the hotel shall be governed by Bahamian law and that the Supreme Court of the Bahamas shall be the exclusive venue for those proceedings. Contrary to plaintiff's suggestion, there is no requirement that the clause detail exactly how it might affect the guest's underlying substantive rights, nor the differences between Bahamian law and the law of the jurisdiction where the guest resides. All that is required is that the clause give adequate notice that its terms and conditions were important matters of contract affecting legal rights. *DeNicola*, 642 F.2d at 9; *Hirsch*, 521 So.2d at 317. This clause does that and, therefore, passes the first prong of the "reasonable communicativeness" test.[5]

---

5. Plaintiff has cited a number of cases in support of its argument that the forum-selection clause does not comply with Florida law on exculpatory clauses. *See Covert v. South Florida Stadium Corp.*, 762 So.2d 938 (Fla. 3rd DCA 2000); *Fana v. Orkin*, 734 So.2d 434 (Fla. 3rd DCA 1999); *Foster v. Matthews*, 714 So.2d 1215 (Fla. 3rd DCA 1998); *Sunny Isles Marina v. Adulami*, 706 So.2d 920 (Fla. 3rd DCA 1998); *Zinz v. Concordia Properties, Inc.*, 694 So.2d 120 (Fla. 4th DCA 1997); *Hertz v. David Klein Manufacturing, Inc.*, 636 So.2d 189 (Fla. 3rd DCA 1994);*Levine v. A. Madley Corporation*, 516 So.2d 1101 (1987). However, as plaintiff's own cases make clear, exculpatory provisions which attempt to relieve a party of liability for their own negligence are generally looked upon with disfavor, and thus strictly construed against the party claiming to be relieved of liability. *Covert*, 762 So.2d at 940; *Foster*, 714 So.2d at 1216; *Sunny Isles Marina*, 706 So.2d at 922; *Zinz*, 694 So.2d at 121; *Hertz*, 636 So.2d at 191; *Levine*, 516 So.2d at 1103. Forum selection clauses, on the other hand, are strongly favored and presumed valid for the policy reasons set forth above, even under Florida law. *Manrique*, 493 So.2d at 440 n. 4 (1986).

The extrinsic circumstances indicating the plaintiff's ability to become meaningfully informed and to reject the contractual terms at stake are equally important in determining enforceability. *Shankles,* 722 F.2d at 863–66. This is what presents the most problematic aspect of this case—how and when the clause was presented to Ms. Humphreys. A forum-selection clause is not fundamentally fair if it is shown that the resisting party was not free to reject it with impunity. *Corna,* 794 F.Supp. at 1011–12 (forum-selection clause unfair and unenforceable where plaintiffs received tickets 2–3 days in advance of cruise and ticket stated on its face that cancellation would result in forfeiture, despite defendants' declaration that the situation had never arisen and that they would likely have refunded the entire purchase price); *Stobaugh,* 5 S.W.3d at 235–36 (clause unfair and unenforceable where, *inter alia,* the passenger contract containing forum-selection clause also contained a cancellation policy indicating on its face that plaintiffs would have been subject to $400 penalty and where defendant had also informed plaintiffs they would receive no refund if they cancelled due to weather); *see also Shute,* 499 U.S. at 595, 111 S.Ct. 1522.

The parties have engaged in a great deal of speculation regarding what might or might not have happened had Ms. Humphreys declined to accept the forum-selection clause. Defendants, like the defendants in *Corna,* contend that the situation had never arisen and that, in all likelihood, Ms. Humphreys would have either been placed in comparable accommodations or allowed to check in without signing the clause. Plaintiff counters that Ms. Humphreys would have been forced to wait in the lobby for hours while Atlantis personnel contacted various layers of management, or would have found herself alone in a foreign country with no place to stay. The Court's conclusions regarding the en-forceability of the forum-selection clause cannot turn on sheer speculation. The Court thus views the proper inquiry in this case not as a question of what might have happened, but rather as a question of whether the objective facts would have led a reasonable person to believe they had some choice under the circumstances.

Here, while Atlantis guests may be afforded sufficient opportunity to *read* the forum selection clause, they have no objectively reasonable opportunity to consider and reject it. It is undisputed that Ms. Humphreys was not told when she made her reservations that she would be required to sign the clause. It is further undisputed that the forum-selection clause was presented to her for the first time upon arrival in the Bahamas, after she had flown there with her two children. Moreover, the manner in which the forum-selection clause is presented to the guest makes it objectively appear to be a required part of the registration process. The guest is told to read and sign, not to read and then decide if they want to sign. This may explain why defendants are not aware of anyone ever refusing to sign the clause; no reasonable person in Ms. Humphreys' position would think they had such an option.

Defendant places much emphasis on the fact that Ms. Humphreys chose not to read the forum-selection clause. The Court is cognizant that this charges her with knowledge of its contents. However, the requirement that Ms. Humphreys be afforded a reasonable opportunity to consider and reject the clause does not turn on her knowledge of its terms. Just as a person who is given reasonable notice of a forum-selection clause may not avoid it by not reading it, defendants cannot escape the requirement that they provide reasonable notice simply because someone did not read the clause in a particular case.

*See Corna,* 794 F.Supp. at 1009 (forum selection clause unreasonable due to insufficient notice despite fact that plaintiff did not read contract, and despite constructive knowledge). As Ms. Humphreys testified, she did not read the clause because she assumed it was a standard clause that hotels require guests to sign. It appears she was correct under the facts of this case. It is a standard clause Atlantis objectively seems to require of its guests—at the last minute. Under these circumstances, Ms. Humphreys was not afforded a meaningful opportunity to consider and reject the clause, thereby rendering it fundamentally unfair. The forum-selection clause thus fails the second prong of the "reasonable communicativeness" test.

The Court has a significant interest in providing its citizens with a forum in which to resolve their disputes. Defendants also have a legitimate interest in limiting the fora in which they can be sued, given the international character of the Atlantis resort. However, if having a forum-selection clause is so important to them, defendants should give potential customers fair warning that they are giving up their right to sue in the forum of their choice. *See Stobaugh,* 5 S.W.3d at 236. Here, defendants have not so much as attempted to provide Atlantis guests with even minimal notice that they would be asked to sign the clause, despite numerous opportunities to do so on its websites and in other promotional materials, at the time the guest makes their reservations, or even by a mailed notice some time before they travel to the Bahamas.[6]

**6.** Because the Court concludes that the clause fails the second prong of the "reasonable communicativeness" test and is therefore unenforceable, the Court does not reach plaintiff's alternative contention that trial in the Bahamas would effectively deny it of a reme-

*Forum Non Conveniens*

*Standard of Review*

 Under the doctrine of *forum non conveniens,* the district court has the inherent power to decline to exercise jurisdiction over a case when an adequate alternative forum is available. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In determining whether to dismiss a case based on *forum non conveniens,* the court must weigh the relative advantages and obstacles to a fair trial in each forum, considering factors of both private and public interest. *Id.* at 508, 67 S.Ct. 839. There is, however, a strong presumption in favor of the plaintiff's chosen forum. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 265–66, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Dismissal on *forum non conveniens* grounds is therefore appropriate only when the plaintiff's chosen forum imposes an undue burden on the defendant, and the private and public factors weigh heavily toward trial in the alternative forum. *Id.* at 249, 266, 102 S.Ct. 252.

 The defendant has the initial burden of establishing that an adequate alternative forum exists with jurisdiction over the whole case. *La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir.1983). This burden is generally satisfied by a showing that the defendant is amenable to process in the alternative forum. *Id.* at 254 n. 22, 102 S.Ct. 252 (*citing Gulf Oil,* 330 U.S. at 506–07, 67 S.Ct. 839). Here, there is no dispute that defendants are amenable to process in the Bahamas, and subject to the jurisdiction of Bahamian courts. In addition, defendants have of-

dy. However, this same contention is relevant to and discussed in the following section regarding *forum non conveniens,* specifically in relation to whether the Bahamas provides an adequate, alternative forum for this dispute.

fered evidence that plaintiff's negligence claims are recognized under Bahamian law and that the statute of limitations has not yet run on this case. And as defendants note, the mere fact that the alternative forum does not provide for contingent fee agreements, operates under different procedures, is less substantively generous, or lacks jury trials, does not render that forum inadequate. *See Piper*, 454 U.S. at 254–55, 102 S.Ct. 252; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430 (11th Cir.1996); *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 (11th Cir.1985); *Lockman Foundation v. Evangelical Alliance*, 930 F.2d 764, 768 (9th Cir.1991). Plaintiff does not quarrel with these principles, and argues only that Bahamian law does not provide any remedy for Chad's death. *See Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252 (a forum with jurisdiction over the defendants may nevertheless be inadequate if it offers the plaintiff no remedy at all).

As the record reflects, the Bahamian law is derived from English common law and recognizes theories of negligence. The Commonwealth of the Bahamas has enacted the "Fatal Accidents Act" and the "Survival of Action Act," which together permit recovery of damages similar to those available under Florida's Wrongful Death Act. *See J.M. Bethell Dec.*, ¶¶ 6—8; § 768.21, Fla. Stat. (2001). The only significant difference between the law of the competing forums is that, under the Bahamian Acts, there is no entitlement for emotional harm to the survivors. *C.L. Parker Aff.*, ¶ 6; *J.M. Bethell Dec.*, ¶¶ 6, 12. However, under Bahamian law, Ms. Humphreys' would be able to recover damages for emotional distress in her own right, since it is undisputed that she was in the immediate vicinity of the event and witnessed the aftermath. *See J.M. Bethell Dec.*, ¶ 12. This concept is akin to our common law torts relating to infliction of emotional distress. Finally, like the Florida Wrongful Death

Act, Bahamian law permits recovery for lost financial support and services. *C.L. Parker Aff.*, ¶ 5; *J.M. Bethell Dec.*, ¶¶ 8. Plaintiff emphasizes that such damages would be unlikely in this case because Chad was a minor without and there would thus be no reasonable expectation of economic benefit. *C.L. Parker Aff.*, ¶ 5; *see also J.M. Bethell Dec.*, ¶¶ 8, 9. However, the rule is essentially the same under Florida law. *See Brown v. Seebach*, 763 F.Supp. 574, 583 (S.D.Fla.1991)(claim for loss of support and services requires deceased minor to have possessed extraordinary income producing abilities). In sum, Bahamian law provides plaintiff with similar rights and remedies as are available under Florida law, albeit perhaps under slightly different theories and procedures with a smaller potential damage award. The courts of the Bahamas are thus an adequate alternative forum for this dispute. *See Piper*, 454 U.S. at 235, 102 S.Ct. 252; *Sigalas*, 776 F.2d at 1519.

*i. Private factors*

 The private interest factors in any *forum non conveniens* analysis include: a) ease of access to sources of proof; b) the availability of compulsory process for attendance of unwilling witnesses, and associated costs; c) the ability to view the premises, if necessary; and d) any other practical problems associated with the expeditious conduct of the trial. *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839. Here, the parties are already in possession of all documents generated in connection with the accident. These materials are likely already in Miami, and defendants have failed to identify any documentary or physical evidence that could not be obtained if the trial were conducted here. *See Reid–Walen v. Hansen*, 933 F.2d 1390, 1397–98 (8th Cir.1991); *Doe v. Sun International Hotels, Ltd.*, 20 F.Supp.2d 1328, 1330 (S.D.Fla.1998). In addition, the ma-

jority of witnesses who reside in the Bahamas are defendants' own agents and employees, who are under defendants' control and will appear voluntarily. *Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss,* p. 15. Defendant has not established that it would be particularly inconvenient or costly to transport these witnesses. Indeed, such a contention would be difficult to sustain in light of Paradise Island's proximity to South Florida, and the ease and frequency of travel between the two locations.

Beyond those witnesses under their control, defendants note that Bahamian government officials have relevant testimony regarding applicable construction and building standards, and that the Bahamian doctors and coroners examined Chad's body in the Bahamas after the incident. The Court finds that defendants have failed to carry their burden of establishing that these matters require live testimony, and that the necessary evidence could not be procured through letters rogatory or some similar procedure. *See Reid–Walen,* 933 F.2d at 1396 (defendant's burden to establish importance of testimony and accessability in the forum)(*citing Piper,* 454 U.S. at 258, 102 S.Ct. 252); *Mediterranean Golf, Inc. v. Hirsh,* 783 F.Supp. 835, 845–46 (D.N.J.1991)(importance of witnesses' testimony is properly considered as private interest factor); *see also* Fed.R.Civ.P. 28(b)(depositions in foreign countries). Indeed, the cause of Chad's death does not even appear to be in dispute. And given that Chad was violently sucked into a drainpipe, there does not seem to be much need for a jury (which there likely will not be if this action is tried in the Bahamas) to view the general lagoon area and facilities. Defendant has not alleged or established that there is anything unusual about the physical layout of the site that cannot be adequately and accurately depicted in photographs and diagrams. Defendants' concerns regarding the ease of access to

sources of proof, the availability of compulsory process for attendance of unwilling witnesses and associated costs, and the ability to view the premises are thus not sufficiently weighty to disturb plaintiff's choice of forum in this case.

■■■■ Defendants' inability to implead potential third-party tortfeasors can be considered a private interest factor under *Gilbert*'s broad consideration of any other factor making trial "easy, expeditious and inexpensive." *Reid–Walen,* 933 F.2d at 1398; *see also Pain v. United Technologies Corp.,* 637 F.2d 775, 790 (D.C.Cir. 1980). The courts thus look to the various theories of recovery in order to determine whether the joinder of potential third-party is in fact crucial to the defendant's case, and also to assess whether separate trials in different forums will require duplication of proofs or create the possibility of inconsistent verdicts. *See, generally, Reid–Walen,* 933 F.2d at 1398–99; *Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339, 343–44 (8th Cir.1983); *Pain,* 637 F.2d at 790–91.

Here, plaintiff's theory is that defendants breached their duty to provide a safe swimming environment for their invitees, not that Splash—acting as defendants' agent—was negligent. Plaintiff's theory is predicated primarily on factual allegations that defendants failed to maintain the pump equipment and related facilities in a safe condition, which the record reflects was within defendants' exclusive control. This is a different legal question from whether Splash may have breached its contractual duty to the defendants with respect to daily inspection of the lagoon and positioning of lifeguards. Given this posture, therefore, it does not appear that plaintiff's case and defendants' theory against Splash will involve significant duplication of proofs, or that defendants could escape liability by showing that Splash was somehow negligent. *See Leh-*

*man,* 713 F.2d at 343–44; *compare Morse v. Sun International Bahamas, Ltd.,* 98–7451–CIV–JORDAN (S.D.Fla. Feb. 26, 2001)(dismissing claim for personal injuries sustained while riding on "banana boat" operated and controlled exclusively by Splash; plaintiff's theory was that Sun Bahamas was responsible for Splash's negligence as its agent, and showing that Splash was not negligent would likely relieve Sun Bahamas of liability). Thus, in this case, it is not unduly burdensome for defendants to pursue a separate indemnification action against Splash in the Bahamas. *See Reid–Walen,* 933 F.2d at 1398.

Defendant also argues that dismissal is appropriate because it will not be able to implead Centex–Rooney or Poole & Kent, the contractors that defendant alleges varied the design specifications for the protective grate in the vicinity of the intake pipes. As an initial matter, the Court notes again that the majority of plaintiff's factual allegations involve defendants' *own* failures, irrespective of whether the protective grate was designed to specifications. For example, plaintiff alleges that defendants failed to inspect the lagoon on a regular basis, failed to close the lagoon and/or shut down the pumps while the grate was removed, failed to maintain the pump room in an accessible condition in case of an emergency, and failed to promptly shut down the pumps after the accident. However, even assuming that there would be significant overlap in proofs in plaintiff's claim and defendants theory against these subcontractors, defendants have not established to the Court's satisfaction that it could not implead them here.

Defendants premise their contention that these contractors are unavailable upon the existence of a voluntary arbitration clause in the construction contracts, which provides alternatively for venue in the Bahamas if suit is filed. However, defendants admit that Sun Bahamas is the party who would not agree to arbitrate, because it preferred to resolve all claims in one proceeding. *Defendants' Memorandum in Reply to Plaintiff's Response to the Defendants' Motion to Dismiss,* p. 10. However, defendants do not assert that these third-parties are beyond this Court's jurisdiction, or that the contractors have in any way indicated that they would seek to enforce the clause laying venue in the Bahamas if sued. *Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss,* p. 16. Rather, defendants appear to suggest that, because the construction contracts contain a venue provision, the contractors would necessarily insist on trial in the Bahamas. *Id.* at 16. Courts considering inconvenience due to a defendant's inability to implead have required a showing of *actual* inconvenience, not a mere hypothetical discussion regarding the efficiency of third-party practice. *Reid–Walen,* 933 F.2d at 1398. This Court similarly declines to deny a citizen its chosen forum based on speculation regarding whether the potential third parties would seek to enforce the venue clause contained in their construction contracts, or whether they would waive it and agree to defend suit here instead of in the Bahamas. *See Lehman,* 713 F.2d at 342 (courts should require affirmative evidence of unusually extreme circumstances and manifest injustice before denying citizens access to United States courts).

*ii. Public factors*

The public interest factors in the *forum non conveniens* analysis include: a) administrative congestion resulting from cases being tried at a site other than that of their origin; b) the burden of jury duty on a community that has no relationship to the cause of action; c) the chosen forum's interest in the dispute; d) the alternative forum's interest in the dispute; and e) the difficulties associated with applying foreign

law. *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839. These factors do not weigh strongly toward dismissal in this case. Admittedly, the Bahamas has an interest in this dispute; a defendant's home forum always has an interest in providing redress for injuries caused by its citizens. *Reid–Walen,* 933 F.2d at 1400. However, beyond this consideration, most of the public interest factors weigh heavily in favor of trial in South Florida. This forum similarly has an interest in providing its citizens with a forum to seek redress for injuries caused by foreign defendants. Administrative concerns such as court congestion cannot be given great weight, particularly in a case such as this where plaintiff's chosen forum has a keen interest in the dispute. *See Doe,* 20 F.Supp.2d at 1330. Defendants' suggestion that South Florida has no interest in this controversy and its jurors would thus be "burdened" by the trial is without merit. As everyone is acutely aware, it involves the violent death of a South Florida boy in Atlantis' swimming lagoon, an international resort marketed heavily to Floridians, where Florida residents vacation on a regular basis. The possibility that Bahamian law will apply is admittedly a consideration. However, fed-

eral courts are often required to decide issues of foreign law. *Lehman,* 713 F.2d at 345. Here, there are no language barriers to the Court's understanding of Bahamian law and, as explained *supra,* Bahamian law is derived from English common law and has many similarities to Florida law. *See Reid–Walen,* 933 F.2d at 1401 (Jamaican law is descended from British law, contains concepts similar to our own, and presents no language barrier).

A plaintiff's chosen forum should only be disturbed if it imposes a heavy burden on the defendant, and if the private and public factors weigh heavily toward trial in the alternative forum. *Piper,* 454 U.S. at 249, 256, 102 S.Ct. 252. Here, the defendants have made a showing that there would be some advantages to trying this case in the Bahamas. However, defendants have failed to demonstrate that trial in South Florida will impose a significant burden upon them, and have also failed to establish that the private and public factors weigh heavily toward trial in the Bahamas. Defendants' showing is thus insufficient to overcome the strong presumption in favor of the plaintiff's chosen forum. Dismissal on grounds of *forum non conveniens* is, therefore, inappropriate.[7]

---

**7.** As part of the *forum non conveniens* analysis, the Court must be sensitive to practical problems likely to be encountered by the plaintiff litigating the claim, particularly when the alternate forum is in a foreign country. *Reid–Walen,* 933 F.2d at 1398; *see also Doe,* 20 F.Supp.2d at 1330. Plaintiff asserts that trial in Nassau would significantly hamper its ability to proceed due to the location of proofs and witnesses. *See Plaintiff's Response,* p. 24–25. The Court need not reach this issue because defendants have failed to establish that dismissal is warranted. However, the Court presumes that Ms. Humphreys and her family would cooperate with plaintiff and travel to Nassau voluntarily. And other than a variety of witnesses who appear to have cumulative testimony regarding the rescue efforts and Ms. Humphreys' mental state, plaintiff has identified only two South Florida

residents who snorkeled around and viewed the grate/housing area in the days leading up to the events. Plaintiff has not established that it could not procure this testimony for use in the Bahamas. Plaintiff's expert's opinion that the use of letters rogatory is a "complicated, protracted and expensive process" is wholly conclusory and fails to state what the process involves, how long it takes and how much it costs. In addition, defendants have stipulated that they will not exercise their prerogative under Bahamian law to have plaintiff post security with the Bahamian court. They have also agreed to concede liability and go to trial only on damages in the Bahamas, making it very likely that Ms. Humphreys could retain a qualified Bahamian lawyer for a nominal fee. Finally, Ms. Humphreys controls a $250,000 bank account for the benefit of her two children, which appar-

## Personal Jurisdiction

### Standard of Review

The Court uses the traditional two-prong test in order to determine whether it has personal jurisdiction over the non-resident defendants in this case. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir.1996). Under the first prong, the Court must determine whether Florida's long-arm statute provides a basis for personal jurisdiction over either of the defendants. *Id.* If the answer to this first inquiry is yes, the Court must then determine whether each defendant has sufficient minimum contacts with this forum so as to satisfy due process. *See International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The plaintiff has the initial burden of establishing a *prima facie* showing of personal jurisdiction. *Cable/Home Communication Corp. v. Network Productions*, 902 F.2d 829, 855 (11th Cir.1990). Once the plaintiff clears this hurdle, the burden shifts to the defendant to challenge the plaintiff's allegations by affidavits or other evidence. *Prentice v. Prentice Colour, Inc.*, 779 F.Supp. 578, 586 (M.D.Fla. 1991). If the defendant sufficiently challenges the plaintiff's assertions, the plaintiff must affirmatively support its jurisdictional contentions with record evidence, and may not merely rely upon the factual allegations set forth in the complaint. *Id.* at 586–87. Where the parties' evidence

conflicts, the Court must construe all reasonable inferences in favor of the plaintiff. *Green v. USF & G Corp.*, 772 F.Supp. 1258 (S.D.Fla.1991).

### Alleged co-mingling

Plaintiff has argued that the corporate structure of the various Sun entities should be disregarded for purposes of determining whether this Court has personal jurisdiction over the defendants. It is unclear whether plaintiff is advancing an alter-ego theory in addition to an agency theory as a basis for personal jurisdiction.[8] However, whether the Florida subsidiaries are defendants' agents or their alter egos are distinct legal questions that must be analyzed separately and have different implications in the jurisdictional analysis. *See MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F.Supp.2d 1346, 1354–58 (S.D.Fla. 2000). This distinction is particularly important here, given that the parties dispute whether plaintiff's claim "arises" from the advertising, marketing and reservations activities performed by the Florida subsidiaries.

In order to "pierce the corporate veil" and impute the Florida subsidiaries' activities directly to the defendants, plaintiffs would have to allege a) that the subsidiaries are mere instrumentalities of the parent, and b) that the defendants engaged in "improper conduct" in the formation or use of the corporations. *MeterLogic*, 126 F.Supp.2d at 1357; *Aldea Com-*

---

ently could be used to prosecute this case. Thus, although the Court makes no specific finding, it does not appear that trial in the Bahamas would be unduly inconvenient or expensive to the plaintiff.

8. For example, plaintiff cites *Sigros v. Walt Disney World*, 129 F.Supp.2d 56 (D.Mass. 2001) for the proposition that defendants should not be able to hide behind the corporate shield for purposes of avoiding personal jurisdiction where there is a "confused inter-

mingling" of activity between two corporations. *See Plaintiff's Response*, p. 9. However, a careful reading of *Sigros* reveals that the issue in that case was whether a related entity was Disney's agent for purposes of specific jurisdiction. Plaintiff later asserts in the general jurisdiction section of its brief that "personal jurisdiction" (presumably general) will attach "if an agency relationship exists between the two corporations, *or* where the corporations are not really separate entities." *Id.* at 14 (emphasis added).

*munications, Inc. v. Gardner,* 725 So.2d 456 (Fla. 2nd DCA 1999). Here, plaintiff has failed to adequately plead sufficient facts to "pierce the corporate veil." [9] However, the parties' have conducted extensive discovery on the jurisdictional issue, and the record is fully developed regarding defendants' relationship with the Florida Sun entities. Therefore, the Court will assume for purposes of this discussion that plaintiff could/did adequately plead an alter-ego theory with respect to the Florida subsidiaries.

As an initial matter, the Court notes that Sun Bahamas is not in a parent-subsidiary relationship with the Florida Sun entities. However, even if it were, the record before the Court does not contain any evidence of the requisite improper conduct necessary to support an alter-ego theory as to either defendant. To the contrary, defendants have carefully structured their corporate relationships and have maintained each entity's separate corporate existence. Plaintiff notes that there is evidence of the sharing of a business address and some overlap of officers and employees between the entities. This, of course, is insufficient to pierce the corporate veil. *MeterLogic,* 126 F.Supp.2d at 1358. Beyond that, plaintiff places great emphasis on the fact that Sun Resorts employees are authorized to sign on Sun Bahamas bank accounts, that Sun Bahamas makes the final decisions regarding Atlantis advertising content, and that defendants' officers and employees frequently travel to the Florida subsidiaries Ft.

Lauderdale offices for the purpose of discussing various financial, administrative and marketing issues relating to the operation of Atlantis. These factors might weigh in plaintiff's favor in a different case. However, under the facts of this case, these activities are entirely proper in light of the Services Agreements between the various Sun entities.

A corporation that hires another corporation to do all its banking must necessarily authorize the latter to sign on its accounts. Similarly, a corporation that hires an advertising agency will want to review and discuss the concepts before they are marketed to the general public. Thus, in this case, there is no evidence of anything other than arm's length transactions between the various Sun entities. There is no evidence of co-mingling of funds between the various corporations. Nor is there any evidence that they are accessing each other's bank accounts or making payments in any improper manner that disregards their separate corporate identities. To the contrary, the Florida subsidiaries are responsible for paying their own operating expenses out of their own budgets and bank accounts, and that they receive a fee from defendants for the functions they perform pursuant to the Services Agreements.

Plaintiff appears to argue that the Court should disregard the corporate structure because, according to plaintiff, it is obvious that the only reason the subsidiaries exist is to perform certain functions for the

**9.** The Complaint here alleges only that Sun Hotels exerts total control over Sun Bahamas, which in turn exerts total control over Island Hotel and Paradise Island in the operations of the Atlantis, and is totally devoid of any allegations that these corporations were formed or used for an improper purpose. *See Complaint* at ¶¶ 18, 19, 23, 24. However, even sufficiently plead allegations that defendants are the alter egos of their Bahamian subsid-

iaries does nothing to advance plaintiff's jurisdictional argument. Plaintiff must reach the Florida subsidiaries' activities under an alter-ego theory in order impute conduct within this forum to defendants. And the only allegation in the Complaint regarding either defendants' relationship with the Florida subsidiaries is that Sun Resorts employees are able to make deposits and write checks on Sun Bahamas' Miami Bank account. *Id* at ¶ 21J.

defendants. However, there is nothing inherently improper about corporations creating subsidiaries to perform specific functions. This is what holding companies do. A contrary finding would "ignore the historical justification for the corporate enterprise system." *See Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So.2d 21 (1955). And this is why Florida, like most jurisdictions, requires a showing of improper conduct *in addition to* a showing of mere instrumentality. *See Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla.1984)("improper conduct" element necessary to pierce corporate veil requires showing that parent used corporate structure to mislead creditors or perpetrate fraud, or co-mingling/conversion/depletion of property or assets without regard to corporate structure); *MeterLogic*, 126 F.Supp.2d at 1357.

Because the Court finds insufficient evidence to "pierce the corporate veil" between defendants and the Florida subsidiaries, the Florida subsidiaries' activities cannot be imputed to either defendant. As such, neither defendant can be said to be directly performing any of the financial, advertising, marketing or reservations activities carried out by the Florida subsidiaries within the state.[10]

*Florida's Long–Arm Statute*

Plaintiff alleges this Court has personal jurisdiction over defendants pursuant to three different provisions of Florida's long-arm statute, as follows:

*i. § 48.193(1)(a)*

■ Plaintiff argues that defendants come within the purview of § 48.193(1)(a), which gives the Court jurisdiction over a party who either directly or through an agent operates, conducts, engages in, or carries on a business or business venture in Florida, or has an office or agency within the state. If satisfied, this subsection confers "specific" personal jurisdiction for any cause of action "arising from" the activities within the state. Although the term "arising from" is somewhat broader than the concept of proximate cause, under Florida law there must nevertheless be some "'direct affiliation,' 'nexus,' or 'substantial connection'" between the cause of action and the activities within the state, *Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*, 635 So.2d 79, 81 (Fla. 1st DCA 1994). This nexus requirement is often described as "connexity," and must be met before specific jurisdiction will attach under this subsection. *Bloom v. A.H. Pond Co., Inc.*, 519 F.Supp. 1162, 1168 (S.D.Fla. 1981).

■ Plaintiff argues that there is a sufficient nexus between Ms. Humphreys' act of making her hotel reservations here in Florida and the tragic accident that occurred in the Bahamas to satisfy the connexity requirement, citing a number of factually similar cases from other jurisdictions. *See Plaintiff's Response*, p. 12, n.1. However, those cases were not construing the Florida long-arm statute, but rather similar statutes from other states.

■ The reach of the Florida long-arm statute is a question of Florida law, and this Court must therefore apply state law. *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890–91 (11th Cir.1983). The Court may also rely on federal construction of state law, in the absence of supervening state court decisions requiring a different interpretation. *Spencer Boat Co. v. Liutermoza*, 498 F.2d 332 (5th Cir.1974). Con-

---

10. Of course, the Court makes no finding and expresses no opinion regarding whether defendants can be held liable for any negligent acts of their Bahamian subsidiaries that may have caused or contributed to Chad's death. As noted, the issue of whether defendants are alter egos of their Bahamian subsidiaries is not before the Court.

struing Florida law, this Court has previously held that a negligence action for personal injuries sustained at a hotel while vacationing in another country does not "arise from" the simple act of making a reservation by calling the hotel's reservations office in Florida. *Limardo v. Corporacion Intercontinental,* 590 F.Supp. 1109, 1111 (S.D.Fla.1984).

> Any alleged negligence on the part of the hotel ... has no real connection to the contractual arrangements for reservations made with an office of the hotel in Miami. This is not a dispute over the price of the accommodations or the type of accommodations bargained for. Similarly, there is no allegation that the hotel breached any sort of implied habitability of its accommodations ...

*Id.* At least one Florida court has cited *Limardo* with approval to hold that a cause of action for personal injuries sustained while driving a rental car in Tunisia was not sufficiently connected to act of reserving rental car by calling an 800 number from Florida. *See Hertz International, Ltd. v. Abadlia,* 540 So.2d 170 (Fla. 4th DCA 1989). Thus, while the reasoning of plaintiff's cases from other jurisdictions might be persuasive, this Court is bound to apply Florida law. And based on *Hertz*'s reliance on *Limardo*, the Court can only conclude that there is no connexity under Florida law in this case. The same deficiency exists with respect to plaintiff's argument that the Florida subsidiaries maintained an "interactive website" that allowed Ms. Humphreys to view rooms and make her reservations on-line. The websites were not created or maintained by either defendant directly, but rather were created and maintained for them by other entities. Hence, there must be connexity between the on-line reservation and the cause of action.

#### ii. § 48.193(2)

■ Plaintiff also argues that defendants come within the purview of § 48.193(2), which give the Court jurisdiction over a party who is engaged in "substantial and not isolated activity" within Florida. There is no connexity requirement under this subsection, and "general" personal jurisdiction attaches regardless of whether or not the cause of action "arises from" the activity within the state. § 48.193(2), Fla. Stat. (2001); *Universal Caribbean Establishment v. Bard,* 543 So.2d 447, 448 (Fla. 4th DCA 1989).

#### a. Sun Hotels

■ Here, despite Sun Hotels' contention that it is not engaged in "substantial and not isolated activity" in Florida, the record reflects otherwise. Sun Hotels is a publicly-traded corporation. It conducts business everyday in the United States on the New York Stock Exchange. As a public corporation, Sun Hotels is required to have an authorized representative in the United States. That authorized representative, John Allison, maintains an office in Ft. Lauderdale, Florida in his capacity as Sun Hotels' CFO in order to satisfy this requirement. Sun Hotels has also selected Ft. Lauderdale, Florida as the location of its executive offices in the United States, and has identified it as such in its SEC filings.

Public corporations must also comply with a myriad of SEC requirements, such as the regular preparation of financial reports and other filings. These SEC-required functions are integral parts of the business of any public corporation. Sun Hotels has chosen to contract with Sun North America, a Florida corporation, to have these important SEC-required functions carried out in Florida. Sun Hotels has also contracted with Sun North America to have a customer relations manager

available for its shareholders in Ft. Lauderdale, Florida. And it is undisputed that all of this has been going on in Florida for several years. Thus, under the facts of this case, the Court finds that Sun Hotels is engaged in "substantial and not isolated" activity in Florida within the meaning of § 48.193(2).

Defendant argues strenuously that general personal jurisdiction cannot attach merely because a corporation has affiliates in or owns all of the shares in a Florida corporation, and also urges that simply signing a guarantee in Florida or having an officer who resides here similarly cannot suffice. As reflected above, the Court does not predicate its conclusion on the mere fact that an officer resides here, or the mere fact that Sun Hotels happens to have a subsidiary here. The Court's conclusion is based on the fact that Sun Hotels has consciously selected Florida as the location of one of its executive offices for SEC purposes, has purposefully chosen to have its financial and securities work performed in Florida by Florida corporation, and has thus selected Florida as the center of its operations for purposes of existing as a publicly-traded corporation within the United States. *See Qualley v. International Air Service Co., Ltd.*, 595 So.2d 194, 196 (Fla. 3rd DCA 1992)(although presence of subsidiary corporation within Florida standing alone is insufficient, parent corporation may nevertheless independently satisfy test for jurisdiction under Florida's long-arm statutes).

### b. Sun Bahamas

■ The facts supporting the conclusion that Sun Bahamas is engaged in "substantial and not isolated" activity in Florida are even more compelling. As the record reflects, Sun Bahamas is also a holding company. It is in the business of owning other corporations that, in turn, own and operate the Atlantis. However, Sun Bahamas has more than simply own

its subsidiaries. It contracts directly for its subsidiaries' benefit. And it does so in Florida. Like Sun Hotels, it has contracted with a Florida corporation (a Sun affiliate) to have all of its financial services performed in Florida. Sun Bahamas has also entered into a contract with a Florida corporation (also a Sun affiliate) to have all of Atlantis' advertising and marketing materials generated in Florida. Sun Bahamas has contracted with yet another Florida corporation (another Sun affiliate) to have almost all reservations for the Atlantis processed through Ft. Lauderdale, Florida. Sun Bahamas officers and employees travel to Florida on a regular basis for meetings to ensure that all of these important services are being performed to their satisfaction. Sun Bahamas maintains numerous bank accounts in Miami, Florida, so that the Florida corporations providing these essential services in Florida may conveniently deposit incoming funds, and also pay for goods and services that Sun Bahamas has itself directly contracted for with other U.S. and Florida vendors. And Sun Bahamas has negotiated and entered into a Repurchase Agreement with City National Bank in Florida, so that it constantly earns interest on its various Miami bank accounts, which indisputably range in the millions of dollars. Again, the Court's conclusion that Sun Bahamas is engaged "substantial and not isolated" activity in Florida is not predicated on the mere existence of Sun affiliates in Florida, or the mere maintenance of bank bank accounts here. It is based on the record, taken as a whole. And the record reflects that Sun Bahamas has purposely chosen to avail itself of the privilege of doing business in this forum on a regular basis. *See Universal Caribbean Establishment v. Bard*, 543 So.2d 447, 448 (Fla. 4th DCA 1989)(foreign corporation that owned and operated resort in Antigua was engaged in "substantial

and not isolated" activity in Florida by virtue of business association with Florida corporation that acted as resort's largest booking agent in the United States; booking agent prepared advertising that was approved by resort, collected payments and made wire transfers to resort's account in United States, handled guest complaints and credits for resort, and existed solely to provide these services to resort).

## Due Process

Mere proof that any one of the subsections of Florida's long-arm statute is satisfied does not automatically confer jurisdiction over a non-resident defendant or end the inquiry. The Court must ensure that the exercise of long-arm jurisdiction does not offend due process. There must, of course, be certain minimum contacts with the forum state, such that a non-resident defendant would reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Where, as here, the Court exercises general personal jurisdiction over a cause of action unrelated to the defendant's activities in the forum state, the due process clause requires that those contacts be "systematic and continuous." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In addition, the exercise of jurisdiction must comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Supreme Court has set forth factors to be considered in determining whether the exercise of personal jurisdiction over a non-resident defendant would be fair. These include the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Id.* at 477, 105 S.Ct. 2174.

The Court concludes that each defendants' respective contacts with this forum not only satisfy Florida's long-arm statute, but are also "systematic and continuous" so as to satisfy due process concerns regarding whether the defendants were reasonably on notice that they might have to defend a suit here. As detailed above, both defendants have purposefully availed themselves of the privilege of doing business in Florida. Sun Hotels has established offices here for purposes of being able to exist as a public corporation. Both entities have entered into extensive, ongoing contracts with Florida corporations for a variety of financial and administrative services. In addition, Sun Bahamas has entered directly into a variety of other contracts in Florida, including the Repurchase Agreement. And representatives from both companies are regularly present in Florida for the purpose of monitoring their business interests here. In sum, both defendants are regularly conducting business in Florida, and those business activities are "systematic and continuous."

Once the Court determines that defendant's contacts are sufficient to satisfy due process, the defendant must present *compelling* evidence of other considerations that would render jurisdiction in the forum unfair. *See Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. Here, the defendants have failed to do so. To the contrary, the record reflects that exercising jurisdiction over these defendants will not impose any undue hardship upon them. The defendants will not be burdened by a suit in some remote location. Indeed, both Sun Hotels and its CFO maintain offices

here. Moreover, Paradise Island, Bahamas is just a short flight from South Florida—so convenient that a variety of Sun Hotels and Sun Bahamas officers and employees travel here regularly for business meetings. And this forum, of course, has a significant interest in the dispute. It involves the tragic death of a South Florida boy in a swimming lagoon at the Atlantis, which is an international tourist attraction in close proximity to South Florida, marketed heavily in Florida, and where 14% of all guests are from Florida.

### iii. § 48.181(3)

Finally, plaintiff alleges that defendants come within the purview of § 48.181(3), which provides that a party who "sells, consigns, or leases ... tangible or intangible personal property, through brokers, jobbers, wholesalers, or distributors ... in this state is conclusively presumed to be both engaged in substantial and not isolated activities within this state and operating, conducting, engaging in or carrying on a business or business venture in this state." Plaintiff argues that defendants activities satisfy this provision because Island Vacations is selling vacation packages to the Atlantis in Florida. As an initial matter, the record reflects that only Sun Bahamas has contracted with the Island Vacations for reservations and bookings services. Thus, if this provision operates to confer personal jurisdiction in this case at all, it does so only with respect to Sun Bahamas.

The parties' briefs regarding this issue address only whether § 48.181(3) confers general or specific personal jurisdiction and, consequently, whether a showing of "connexity" is also required. *See Defendants' Motion to Dismiss*, p. 9; *Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss*, p. 7; *Plaintiff's Response to the Defendants' Motion to Dismiss*, p. 14–15; *Defendants' Memorandum in Reply to Plaintiff's Response to the Defendants' Motion to Dismiss*, p. 2. However, equally important questions exist regarding whether reservations or vacation packages qualify as "tangible or intangible personal property" and, if so, whether Island Vacations qualifies as a "broker, jobber, wholesaler, or distributor" within the meaning of the statute. Neither side has addressed these questions, and defendants simply suggested at oral argument (without any support) that Island Vacations' activities might not qualify under this subsection. Because the parties have not briefed these issues nor developed the factual record on these points, and because the Court has determined that both defendants' are subject to general personal jurisdiction under 48.193(2), the Court need not, and therefore does not, reach plaintiff's alternative theory under 48.181(3).

### CONCLUSION

Based on the foregoing, and after careful review of the record, Defendants' Motion to Dismiss [DE # 15–1] is hereby DENIED.